## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| IN RE | ) | |
| | ) | |
| AMERICAN CONSOLIDATED | ) | |
| TRANSPORTATION COMPANIES, INC., | ) | Bankruptcy No. 09-26062 |
| *et al.*, | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |
| | ) | |
| AMERICAN CONSOLIDATED | ) | |
| TRANSPORTATION COMPANIES, INC., | ) | |
| *et al.*, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Adversary No. 10-00154 |
| | ) | |
| RBS CITIZENS N.A., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION ON MOTION OF RBS CITIZENS N.A. TO DISMISS COUNTS I THROUGH VI AND VIII

This Adversary proceeding relates to the Chapter 11 case filings by American

Consolidated Transportation Companies and its related companies (collectively, "American").[1]

The Complaint attacks the claim filed by American's principal secured lender, defendant RBS

Citizens N.A., d/b/a Charter One (the "Bank"). American complains that the Bank induced

American to enter a loan containing provisions that the Bank knew American could not meet,

---

[1] American Consolidated Transportation Companies, Inc., is the lead debtor in a jointly administered bankruptcy case (bankruptcy case no. 09-26062). The other debtors are Davidsmeyer Bus Service, inc. (09-26067), Mid-America Charter Lines, Inc. (09-26069), Central States Coach Parts, Inc. (09-26072), Mid-America Tours, Inc. (09-26073), Central States Coach Repairs, Inc. (09-26074), Mid-America Travel, Inc. (09-26075), Colorado Charter Lines, Inc. (09-26078), Central West Motor Stages, Inc. (09-26079), and D&B Rental, LLC (09-26083).

then improperly used American's default of those provisions to take control of and attempt to sell American's businesses, and thereby to recoup the Bank's loan.

American's attack on the Bank's claim takes the form of an eight-count Complaint. American seeks equitable subordination of the Bank's claim (Count I) and damages for violations of the Illinois Consumer Fraud and Deceptive Business Practices Act (Count II), breach of fiduciary duty (Count III), breach of duty of good faith and fair dealing (Count IV), and duress (Count V). American also objects to and seeks subordination of the Bank's swap claim (Count VI), objects to the amount and perfection of the Bank's claim (Count VII), and objects to the Bank's claim on the grounds that the Bank is not the properly named party in the recorded documents evidencing its security interest (Count VIII).

The Bank moved to dismiss Counts I through VI and VIII American's Complaint for failure to state a claim pursuant to Rule 12(b)(6) Fed. R. Civ. P., made applicable in this proceeding by Rule 7012(b) Fed. R. Bankr. P.

## ALLEGATIONS OF THE COMPLAINT

In 2004, the Bank acquired Charter One Financial, Inc., and its subsidiaries in order to gain access to and expand in Charter One's markets. Following that acquisition, in 2005 and 2006, the Bank decided to expand aggressively in the Chicago market by, among other things, extending loans that contained covenants that either the borrowers did not meet or that the Bank knew the borrowers would not meet in the future.

In September and October of 2006, as part of its expansion plan, the Bank entered into a banking relationship with American, a bus and travel company based in Elk Grove Village, Illinois. During those two months, the Bank and American executed a series of documents. On

September 27, 2006, the Bank and debtor D&B Rental, LLC, executed a variable rate term note in the principal amount of $4 million. Shortly thereafter, on October 2, 2006, the Bank and debtor D&B Rental, LLC, executed an interest rate swap agreement, under which D&B Rental, LLC, was to pay a fixed interest rate rather than the variable rate called for in the September 27th term note. Then, on October 12, 2006, the Bank entered into a separate transaction with the debtors other than D&B Rental, LLC. That transaction consisted of a loan and security agreement, a $1 million term note, and a $1 million revolving demand note.

The Bank was then aware of American's business problems. Internal reports prepared before the loans were executed show the Bank knew that American had just lost a major account, a loss that would reduce American's annual revenue by approximately $3 million, or 25% of American's total revenue. Those reports also show that the Bank questioned some assumptions it had earlier made about American's business, such as American's ability to increase its sales, reduce its costs, and increase its prices in order to offset the lost major account. Indeed, the Bank considered American's profitability to be "consistently below average" and its liquidity "weak." Additionally, the reports show that, despite these "fundamental" concerns about the loans, the Bank expected that it would be able to charge and collect substantial fees and other revenue from American by providing ancillary services, such as commercial depository account services, letters of credit services, and merchant business services. The Bank also anticipated that it would charge and collect substantial fees and penalties under the swap agreement, including approximately $130,000 in initial fees and $550,000 in penalties in the event of a default.

The Bank did insist upon some protection of its position in the October 12th loan and security agreement. In addition to granting the Bank an extensive security interest, the document

-3-

contains a number of covenants of default, two of which are most relevant here. The first

required American to maintain a combined tangible net worth of $100,000 as of December 31,

2006, with an annual step up of $150,000. The second required American to maintain a

minimum cash flow so that the ratio of earnings to payments on the loans was always at least

1.20 to 1.00.

Because of the lost major account that had previously accounted for nearly 25% of

American's revenues, American was in default of the cash flow covenant at the time when the

loan documents were executed. Although American contends that it was never in default of the

tangible net worth covenant, an internal report by the Bank in April 2007 showed that American

failed to meet either of the two covenants in 2006 after the loans closed. However, no reported

action was taken against American for twenty months.

On June 10, 2008, the Bank sent American a default and acceleration letter stating,

among other things, that the loans were default and had to be paid immediately because

American was in default of the net worth and cash flow covenants. At the time, American was

current on its payments under the loans and was not in default of any other loan provision.

The Bank's internal documents from September 2008 show that the Bank was then

considering implementing a 120-day forbearance in order to provide American with time to

obtain alternative financing or to sell or liquidate business assets. The Bank and American did

enter into a Forbearance Agreement on December 19, 2008, and a First Amendment to the

Forbearance Agreement on March 11, 2009. The Bank's internal documents show that the Bank

entered into these Agreements in order to obtain additional liens on real estate in Colorado and

Texas owned by American and to perfect its liens on American's busses and other collateral under the original loan agreement.

The Forbearance Agreements also required American to hire a chief restructuring consultant of the Bank's choosing, and to give to that consultant extensive managerial responsibility over American's businesses and the primary responsibility for marketing and selling those businesses. In internal documents, the Bank stated that it was "pressuring to have [the consultant] in more of a chief restructuring officer role." In particular, the Bank required that American authorize the consultant to communicate directly with the Bank regarding all aspects of American's finances and any proposed refinancing or sale of American's businesses; direct the consultant to review, verify, and provide to the Bank all required financial reports; cooperate fully with the consultant in connection with any refinancing or sale and continue to retain the consultant until the loans were repaid; and agree that the Bank may rely on information provided by the consultant in connection with any refinancing or sale.

The Bank insisted that the chief restructuring consultant have a number of specific management duties, including: directing any sale process; providing financial analysis assistance to American to identify cost savings and improvement of margins; assisting American's Chief Executive Officer on any major business decisions; assisting the C.E.O. in supervising all of American's officers, employees, and consultants, including hiring and firing decisions and compensation; assisting American in preparing a cash flow plan and management of cash activity, including control of disbursements as to timing, priority, and amount; reviewing all check requests and other payments made pursuant to American's budget; assisting the C.E.O. in

-5-

supervising all professionals, including attorneys and accountants; and assisting American in complying with the Forbearance Agreements and loan documents.

Although American wished to remain in business, the Forbearance Agreements also required American to take an active role in selling its own businesses. Specifically, it required American to use its best efforts to enter into a sale or refinancing transaction that would repay the Bank in full; to deliver to the Bank on or before May 29, 2009, at least one bona fide letter of intent or similar document for a sale or refinancing; to remit any deposit received from a perspective purchaser to the Bank; to transmit all written offers to the Bank; to deliver to the Bank an offering memorandum prepared by the chief restructuring consultant; to send out "teasers" and confidentiality agreements as requested by interested parties; to prepare due diligence materials for review by parties that execute confidentiality agreements; and to deliver to the Bank every two weeks an updated list of parties that expressed interest in a sale or refinancing.

The Bank itself also actively sought proposals to liquidate American. In the Spring or early Summer of 2009, the Bank contacted several asset liquidation companies, and would have engaged one, had American not filed for bankruptcy.

Based on the obligations owed by American to the Bank under the loan documents, the Bank filed the proof of claim in American's Chapter 11 bankruptcy case that is attacked by this Adversary proceeding. That claim asserted a total liability of $6,008,538.21, which includes:

1.    $986,883.28 on account of the October 12th revolving demand note, consisting of $573,028.84 in principal, $6,862.33 in accrued interest, and $406,892.00 in letter of credit exposure;

2.   $541,386.61 on account of the October 12th term note, consisting of $533,333.52 in

principal and $8,053.09 in accrued interest;

3.   $3,892,512.88 on account of the September 27th term note, consisting of $3,828,214.00

in principal and $64,093.88 in accrued interest;

4.   $549,317.54 on account of the swap agreement; and

5.   $38,437.90 on account of the forbearance agreement, consisting of a forbearance fee of

$30,000, appraisal fees of $5,700, and overdraft fees of $2,737.90.

## DISCUSSION

In its Motion to Dismiss, the Bank makes arguments that fall into three categories:

challenges to the plausibility of American's pleadings; assertions that some Counts represent

affirmative defenses and not causes of action under Illinois law; and assertions of affirmative

defenses.

## I. PLAUSIBILITY OF AMERICAN'S FACTUAL ALLEGATIONS

"A pleading which sets forth a claim for relief, whether an original claim, counterclaim,

cross-claim, or third-party claim, shall contain . . . a short and plain statement of the claim

showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2) (made applicable in this

proceeding by Fed. R. Bankr. P. 7008). "To survive a motion to dismiss, a complaint must

contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its

face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550

U.S. 554, 570 (2007)). A complaint is plausible "when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Id.* (*citing Bell Atl.*, 550 U.S. at 556). Plausibility does not require probability, but does

-7-

require something "more than a sheer possibility that a defendant has acted unlawfully." *Id.*

(*citing Bell Atl.*, 550 U.S. at 556). That is, the claims in the complaint must be more than

"conceivable," *Tully v. Barada*, 599 F.3d 591, 593 (7th Cir. 2010), but not necessarily

"probable," *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009).

The Bank argues that American did not adequately plead four of its claims: equitable

subordination (Count I); violations of the Illinois Consumer Fraud and Deceptive Business

Practices Act (Count II); breach of fiduciary duty (Count III); and objections to the Bank's

identity and perfected status (Count VIII).

## A. Equitable Subordination (Count I)

Under the principles of equitable subordination, a claim may be subordinated to other

claims or interests, and any lien securing a subordinated claim may be transferred to the debtor's

bankruptcy estate. 11 U.S.C. § 510(c). To subordinate a particular claim, a debtor must show: (1)

the claimant engaged in some type of inequitable conduct; (2) the misconduct resulted in injury

to the debtor's creditors or conferred an unfair advantage on the claimant; and (3) subordination

is not inconsistent with the provisions of the Bankruptcy Code. *In re Kreisler*, 546 F.3d 863, 866

(7th Cir. 2008) (*citing United States v. Noland*, 517 U.S. 535, 538–39 (1996)). "The creditor

must have done something inequitable—a wrong or an unfairness or, at the very least, a

masquerade of something for what it is not." *In re Lifschultz Fast Freight*, 132 F.2d 339, 344

(7th Cir. 1997). The types of conduct generally considered inequitable are: "'(1) fraud, illegality,

breach of fiduciary duties; (2) undercapitalization; and (3) [the] claimant's use of the debtor as a

mere instrumentality or alter ego.'" *Kreisler*, 546 F.3d at 866 (*quoting Lifschultz Fast Freight*,

132 F.3d at 344–45) (alteration in original).

The level of inequitable conduct required depends on the legal relationship between the

debtor and the claimant. *In re Kids Creek Partners, L.P.*, 200 B.R. 996, 1015–16 (Bankr. N.D.

Ill. 1996) and cases cited. When a claimant owes a fiduciary duty, equitable subordination of the

fiduciary's claim is appropriate "unless the fiduciary can show that the transaction giving rise to

the contested claim carried 'the earmarks of an arm's length bargain.'" *Id.* at 1015 (*quoting*

*Pepper v. Litton*, 308 U.S. 295, 306 (1939)). If the claimant is not a fiduciary, its claim may still

be equitably subordinated, but only if its conduct was particularly egregious. *Id.* That is, the

claimant must be "guilty of gross misconduct tantamount to fraud, overreaching or spoliation to

the detriment of others." *Id.* (internal citations and quotation marks omitted).

American attempts to plead, first, that the Bank was a fiduciary of American and, second,

that the Bank's conduct was inequitable. However, American does not plausibly plead either

point.

### 1. American Did Not Plausibly Allege That the Bank Was a Fiduciary of American

"[A] debtor-creditor relationship is not a fiduciary relationship as a matter of law."

*Pommier v. Peoples Bank Marycrest*, 967 F.2d 1115, 1119 (7th Cir. 1992) (*citing Paskas v. Illini*

*Fed. Savings & Loan*, 440 N.E.2d 194 (Ill. App. Ct. 1982)). Thus, a lender is not generally a

fiduciary of its borrowers. *See Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908

F.2d 1351, 1357 (7th Cir. 1990) ("Parties to a contract are not each others' fiduciaries; they are

not bound to treat customers with the same consideration reserved for their families."); *see also*

*In re W.T. Grant Co.*, 699 F.2d 599, 609 (2d Cir. 1983) (creditor is not a fiduciary of a debtor in

the collection of its claim). However, a lender that exerts control over a borrower may owe a

fiduciary duty to that borrower. *Kids Creek Partners*, 200 B.R. at 1015. Control may be shown

-9-

by the actual exercise of managerial discretion to such an extent that the lender usurps the power of the borrower's directors and officers to make business decisions. *Id.* at 1016; *In re Clark Pipe & Supply Co.*, 893 F.2d 693, 701 (5th Cir. 1990) (lender must exercise "such total control over the debtor as to have essentially replaced its decision-making capacity with that of the lender"). That is, the lender must have operating control of the borrower's businesses. *Kids Creek Partners*, 200 B.R. at 1016.

Control does not exist simply because there is a great imbalance in bargaining power, as a borrower's primary lender invariably has significant leverage when it is on the brink of closing down a borrower's business. *Id.* Control must be so overwhelming that there is a merger of identity or a domination of the borrower's will. *Id.* For example, a lender controls its borrower when it has a legal right to a controlling interest in the borrower's stock, effectuates termination of all employees except those necessary to liquidate the business, contracts for a security force to guard the borrower, determines which of the borrower's creditors are paid, and tells a corporate officer he can quit if he disapproves of the lender's conduct. *In re Badger Freightways, Inc.*, 106 B.R. 971, 977 (Bankr. N.D. Ill. 1989). In contrast, control is not established when a lender insists on standard loan agreement restrictions, closely monitors the borrower's finances, and makes business recommendations, even if the context of heated negotiations. *Id.* Nor is control established when a borrower hires a management or restructuring consultant selected by the lender. *Id.* at 978–79 (*citing In re Prima Co.*, 98 F.2d 952, 965 (7th Cir. 1938)).

It is not plausible to conclude from American's allegations that the Bank exercised sufficient control over American to become a fiduciary. American complains that the Bank forced it to enter into the Forbearance Agreement in 2008 after the Bank declared American in

-10-

default and to take steps towards selling the business pursuant to the Forbearance Agreement even though American wanted to remain in business. However, none of these actions usurped managerial control from American's directors and officers. American could have chosen to allow the Bank to foreclose on its security interest rather than entering into the Forbearance Agreement and granting the Bank additional collateral at the Bank's request. The Bank did not make those decisions for American. American seems rather to have been facing a "Hobson's choice" between financial collapse and forbearance on the Bank's terms, a choice not unusual in the present economy. Had its business been economically attractive to other lenders, American could have refinanced and avoided that choice. Since it was not, it accepted the lifeline offered by the Bank.

American also complains that Bank insisted that the restructuring consultant have wide-ranging managerial duties. Recommending a consultant is insufficient to establish control. *Badger Freightways*, 106 B.R. at 978–79 (citing *In re Prima Co.*, 98 F.2d 952, 965 (7th Cir. 1938)). Even if it was sufficient, the consultant in this case was limited to advising and assisting in any business decisions, and was not given the power to make any business decision unilaterally. American does not allege any facts showing that the Bank actually had operating control over American's business. For example, American does not allege that the Bank directed or controlled which creditors American paid, that it hired or fired employees, or that the Bank made any other similar intrusion into the day-to-day operations of American. Therefore, American did not plausibly allege facts showing that the Bank had a fiduciary relationship with American.

## 2. *American Did Not Plausibly Allege That the Bank Acted Inequitably*

Because American did not plausibly plead that the Bank was a fiduciary, American must alternatively plead facts showing particularly egregious conduct by the Bank that is tantamount to fraud. *See Kids Creek Partners*, 200 B.R. at 1015. American alleges six instances of supposed inequitable conduct by the Bank, none of which are plausibly pleaded.

First, American complains that the Bank induced it to enter into the loans by representing that the Bank would not call a default so long as American was current on the loan payments, but then called a default less than two years later even though American was current on the payments. However, this is not a plausible reading of American's factual allegations. American alleges that the Bank knew before the loans were executed that American had lost a major account and that the Bank had concerns about the loans before they were executed. Indeed, a Bank report from April 2007 showed that American was in default of the cash flow and net worth covenants in the first few months after the loans were executed. American does not allege who made the purported representation to American that it would forbear from enforcement, or when or how that person made it. Without more, it is not plausible to infer that the Bank affirmatively told American that it would not enforce terms in the loan documents contrary to the plain language of those documents.

Second, American asserts that the Bank made a demand and accelerated the loans when it was not concerned that the loan would not be repaid. It is not clear what facts American relies on for its conclusion that the bank was not worried about being repaid when it made its demand. Perhaps it is relying on the fact that the Bank did not make a demand until more than a year after it first noted that American was in default of the net worth and cash flow covenants. Any number

of scenarios could have caused the delay: American may have improved its businesses and cured

the defaults, or the Bank may have decided to wait to enforce the covenants until the defaults

became particularly egregious and risky. Without more, it is not plausible to conclude that the

Bank was not concerned that American's defaults might presage non-payment of the loans.

Third, American complains that the Bank called the defaults only to regain the capital

loaned to American so that the Bank could use it for other purposes. American offers no factual

allegations in support of this conclusory statement. The Bank then believed that American was in

default of the net worth and cash flow covenants. It is not plausible that the Bank called the

default based only on some other reason. Moreover, it is not clear why it is plausible to argue that

it is inequitable for a creditor to seek payment of a debt to it for use of the money in other loans.

Creditors may make business judgments in their favor without those being treated *per se* as

insidious conduct.

American further complains that the Bank induced American to enter into the

Forbearance Agreement giving the Bank additional collateral and forcing American to pursue

strategies it did not want to pursue; that the Bank forced American to retain a restructuring

consultant against American's wishes and on terms dictated by the Bank; and that the Bank

forced American to implement a plan to sell its business against its wishes. However, American

could have refused the Bank's demands and allowed it to pursue its contract remedies. Instead,

American chose to accede to the Bank's requests. As discussed above, American does not allege

particular facts showing that the Bank dominated American's will or otherwise took away

American's managerial discretion. It is not plausible to conclude that the acts complained of, or

any of the other alleged acts of inequitable conduct, were anything other than hard bargaining from a superior negotiating position.

The Complaint shows little more than the Bank taking hard steps to protect itself during years when the real estate market generally was in collapse. Because American has not plausibly alleged that the Bank was a fiduciary or that it acted inequitably, Count I will be dismissed for failure to state a plausible claim.

## B. Illinois Consumer Fraud and Deceptive Business Practices Act (Count II)

To establish a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, a plaintiff must show that: "(1) the defendant undertook a deceptive act or practice; (2) the defendant intended that the plaintiff rely on the deception; (3) the deception occurred in the course of trade and commerce; (4) actual damage to the plaintiff occurred; and (5) the damage complained of was proximately caused by the deception." *Davis v. G.N. Mortgage Corp.* 396 F.3d 869, 883 (7th Cir. 2005) (*citing Capiccioni v. Brennan Naperville, Inc.*, 791 N.E.2d 553, 558 (Ill. App. Ct. 2003)); 815 Ill. Comp. Stat. 505/2. The plaintiff must plead any claim under the Act with the same specificity required of common law fraud claims. *Davis*, 396 F.3d at 883 (*citing Elson v. State Farm Fire & Cas. Co.*, 691 N.E.2d 807, 816 (1998)). That is, the plaintiff must plead the circumstances constituting the claim in detail: "the who, what, when, where, and how." *Arazie v. Mullane*, 2 F.3d 1456, 1458 (7th Cir. 1993).

The first deceptive act that American alleges is the Bank's enforcement of covenants of default in 2008 as a pretext to liquidate American's business and regain its capital, even though the Bank knew that American was in default of those covenants when the loans were executed in 2006. To show that the Bank knew about the defaults, American alleges that employees had

"fundamental" concerns about the loans, that the Bank knew that American had just lost a major account that accounted for 25% of American's revenue, that the Bank questioned the propriety of the loan in internal documents, and that the Bank ignored these concerns because it wanted to generate fees from the loan and the swap agreement. However, American does not allege who at the Bank had concerns about the loan, who it was that decided to disregard these concerns, what the Bank knew about American's compliance with the covenants specifically, or when these decisions were made. Moreover, it is not plausible to conclude from these allegations that the Bank in fact *knew* that American was then in default of the covenants when the loan was executed. Having concerns about a borrowers ability to perform under a loan is not the same thing as knowing that the borrower is in breach of specific covenants in a new agreement.

To show that the Bank used the defaults as a pretext, American alleges that the Bank encountered its own capital shortfalls in 2007 or 2008; that an internal bank document from September 2008 shows that the Bank wanted to forbear on the American loans for 120 days to give it time to obtain alternative financing or liquidate; and that despite defaulting on the minimum cash flow and minimum tangible net worth covenants, American was current on its payments to the Bank. American does not allege, however, how calling American's loan early would help the Bank's alleged capital shortfalls, why the Bank would not otherwise have enforced the covenants, or when the Bank decided to enforce the covenants as a pretext. Moreover, it is not plausible on the face of these sparse and conclusory pleadings that the Bank used American's default as a pretext to control American and recoup its capital. When a borrower violates a covenant of default (including defaults on minimum cash flow and minimum tangible net worth covenants), a lender is generally entitled under contract to enforce its rights. If

the lender chooses to forbear, then it is entitled to protect its interests and take steps to ensure the

borrower does not default again. To suggest that the lender has some other nefarious motive

without alleging specific facts to justify an invidious interpretation of a common commercial

protective motive is insufficient.

The second supposedly deceptive act that American asserts is the Bank's enforcement of

the covenants of default when it had no cause for insecurity. In support, American alleges that it

was current on all payments when the bank called the defaults. This not enough to plead

plausibly that the Bank had *no* cause for insecurity. Even if American was current in its payments

at the time, violation of the other covenants of default could have given the Bank reason to

believe that American would not make payments in the future or that the value of its security was

declining or threatened. American has not alleged facts showing that it was actually in good

financial health and able to meet its future obligations under the loan documents. Therefore, it

has not plausibly pled that the Bank enforced the covenants when it had no cause for insecurity,

particularly when American concedes that it was in default of the cash flow covenant.

The United States economy and real estate market suffered from a historic deep recession

while the events complained of here were unfolding. Adequate pleading would have to show

more than a creditor protecting itself during that period.

American's third alleged deceptive act is the Bank's inducement of American to enter

into the swap agreement. The purpose of the swap agreement was to allow American to pay a

fixed interest rate on the September 27th term note between the Bank and D&B Rental, LLC,

rather than the variable rate originally called for in that loan. American alleges that the swap

agreement did not make economic sense for American unless the Bank's loan ran for the full ten-

year term, that the Bank knew that the loan would not run the full ten years, and that the Bank induced American to enter the swap agreement anyway so that the Bank could collect initial fees if $130,000 and penalties of $550,000 in the event that American defaulted. As discussed above, American has not plausibly pleaded that the Bank knew for certain that American was in default at the time of execution, and American has not pled any other facts that would show that the Bank knew that the loan would not run to term. Without more, it is not plausible that the Bank would risk its principal by extending a loan that it knew it would call early and would have trouble collecting, simply to collect relatively small fees and penalties from American.

Because American does not plausibly or particularly allege any deceptive acts by the Bank, Count II will be dismissed for failure to state a claim.

## C. Breach of Fiduciary Duty (Count III)

To show a breach of fiduciary duty under Illinois law, a plaintiff must establish: "(1) a fiduciary duty on the part of the defendant, (2) a breach of that duty, (3) an injury, and (4) a proximate cause between the breach and the injury." *Alpha School Bus Co. v. Wagner*, 910 N.E.2d 1134, 1158 (Ill. App. Ct. 2009). A lender owes a fiduciary duty to a borrower only when the lender exerts overwhelming operational control over the borrower. *In re Kid Creek Partners, L.P.*, 200 B.R. 996, 1016 (Bankr. N.D. Ill. 1996). As discussed above, American has not plausibly pled that the Bank exerted control of that nature over American. *See supra* part I.A.1. Therefore, American has not shown that the Bank owed a fiduciary duty to American that it could breach, and Count III will be dismissed for failure to state a claim.

### D. Identity and Perfected Status of the Bank (Count VIII)

In Count VIII, American objects to the Bank's claim on the basis that it does not owe any money to the Bank; and even if it did, the Bank is not perfected and therefore the Bank's lien is avoidable under 11 U.S.C. § 544. However, neither of these assertions show facts that contradict the contractual obligations to repay debt or show a specific factual basis why the debt was not perfected. Count VIII is not plausibly pleaded, and shall be dismissed without prejudice to American establishing evidence in defense of the Bank's claim to contest the amounts due on the claim.

#### 1. American Admitted That it Owes its Obligations under the Loan Documents to the Bank

American first argues that the loan documents show that it owes its obligations to "Charter One Bank, N.A.," while the Bank's proof of claim form identifies the Bank as "RBS Citizens, N.A. d/b/a/ Charter One." However, in the Forbearance Agreement, American acknowledged that it owed its obligations under the loan documents to "RBS Citizens, National Association as Successor by Merger with Charter One Bank, NA." Similarly, in the First Amendment to the Forbearance Agreement, American acknowledged that it owed its obligations to "RBS Citizens, N.A. D/BA Charter One, Successor by Merger with Charter One Bank, NA." As discussed below, both of these documents are properly considered on the Bank's Motion to Dismiss. *See infra* Part III.A. Moreover, American has engaged in many months of litigation over use of cash collateral with the Bank during the pendency of American's bankruptcy case. During that litigation, American has always treated the Bank as the proper lender. In the face of these admissions, American cannot now claim that it owes no debt to the Bank.

### 2. The Names of the Secured Parties on the Financing Statements Do Not Affect the Bank's Perfected Status

A financing statement that perfects a security interest is sufficient only if it provides, among other things, the name of the secured party or a representative of the secured party. 810 Ill. Comp. Stat. 5/9-502(a)(2); Del. Code Ann. tit. 6, § 9-502(a)(2). However, a financing statement is effective, "even if it has minor errors or omissions, unless the errors or omissions make the financing statement seriously misleading." 810 Ill. Comp. Stat. 5/9-506(a); Del. Code Ann. tit. 6, § 9-506(a). "Inasmuch as searches are not conducted under the secured party's name, and no filing is needed to continue the perfected status of [a] security interest after it is assigned, an error in the name of the secured party or its representative will not be seriously misleading." U.C.C. 5-506 cmt.2.

American argues that even if it does owe money to the Bank, the Bank is not properly perfected, and therefore the Bank's lien is avoidable under 11 U.S.C. § 544. American points out that the financing statements attached to the Bank's proof of claim, which were filed either in Illinois or in Delaware, list "Charter One Bank, N.A." as the secured party rather than "RBS Citizens, N.A. d/b/a/ Charter One." However, because any error in the name of a secured party on a financing statement is not seriously misleading, the Bank's financing statements are still valid to perfect the Bank's security interests in American's collateral. American does not allege any other facts that would support a finding that the financing statements were seriously misleading.

Therefore, Count VIII will be dismissed for failure to state a claim.

## II. CLAIMS ASSERTED UNDER ILLINOIS LAW

The Bank challenges two of American's claims—breach of the covenant of good faith and fair dealing (Count IV) and duress (Count V)—on grounds that Illinois law does not recognize these as independent claims.

Every contract under Illinois law contains an implied covenant of good faith and fair dealing. *N. Trust Co. v. VIII S. Mich. Assocs.*, 657 N.E.2d 1095, 1104 (Ill. App. Ct. 1995). The covenant of good faith and fair dealing is "a rule of construction, rather than an independent source of tort liability." *Voyles v. Sandia Mortgage Corp.*, 751 N.E.2d 1126, 1132 (Ill. 2001); *accord Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1443 (7th Cir. 1992). The implied covenant simply "limits the exercise of discretion vested in one of the parties to a contract." *Beraha*, 956 F.2d at 1443.

Under Illinois law, economic duress is also not an independent tort. *Dahl v. Fed. Land Bank Assn. of W. Ill.*, 572 N.E.2d 311, 314 (Ill. App. Ct. 1991); *Shields Enters., Inc. v. First Chi. Corp.*, 975 F.2d 1290, 1297–98 (7th Cir. 1992). Economic duress may be only a defense to enforcement of a contract or the basis for restitution or rescission of a contract. *Lawless v. Cent. Prod. Credit Ass'n*, 592 N.E.2d 1210, 1217 (Ill. App. Ct. 1992).

Counts IV and V are defensive in nature, not affirmative claims recognized as causes of action under Illinois law. Therefore, prayers for relief based on those two Counts will be dismissed for failure to state a claim, but the Counts may stand as defenses to the Bank's claim.

## III. RELIANCE ON AFFIRMATIVE DEFENSES

An affirmative defense is "[a] defendant's assertion of facts and arguments that, if true, will defeat the plaintiff's . . . claim, even if all the allegations in the complaint are true." Black's

Law Dictionary 451 (8th ed. 2004). A defendant must ordinarily plead and prove an affirmative

defense. *Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, No. 09-2781, ___ F.3d ____, 2010

WL 2485678, at *1 (7th Cir. June 22, 2010); *see* Fed. R. Civ. P. 8(c) (made applicable by Fed. R.

Bankr. P. 7008).

Affirmative defenses may of course be asserted through Motions for Summary Judgment,

but that procedure has not been followed here. In a limited circumstance, however, a defendant

may raise affirmative defenses in a motion to dismiss under Rule 12(b)(6):

> Orders under Rule 12(b)(2) are not appropriate responses to the invocation
> of defenses, for plaintiffs need not anticipate and attempt to plead around
> all potential defenses. Complaints need not contain *any* information about
> defenses and may not be dismissed for that omission.

> Only when the plaintiff pleads itself out of court—that is, admits all the
> ingredients of an impenetrable defense—may a complaint that otherwise
> states a claim be dismissed under Rule 12(b)(6).

*Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004) (internal citations

omitted) (emphasis in original). "[T]he validity of the defense [must] be both apparent from the

complaint itself and unmistakable, so that the suit is fairly describable as frivolous." *Walker v.*

*Thompson*, 288 F.3d 1005, 1010 (7th Cir. 2002) (internal citations omitted).

In this case, the Bank asserts two affirmative defenses in its Motion to Dismiss: first, that

American waived and released its claims against American in certain loan documents; and

second, that American's claims are barred by the Illinois Credit Agreements Act. The Bank bases

its waiver and release defenses on two documents: one attached to the Complaint and another

attached to the Bank's Motion to Dismiss.

## A. Consideration of the Forbearance Agreement and the First Amendment to that Agreement is Proper

"A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." Fed. R. Civ. P. 10(c) (made applicable by Fed. R. Bankr. P. 7010). In addition, "documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim." *McCready v. eBay, Inc.*, 453 F.3d 882, 891 (7th Cir. 2006) (internal quotation marks and citations omitted).

In asserting these defenses of waiver and release, the Bank relies on a Forbearance Agreement between American and the Bank and the First Amendment to that Agreement. American attached the First Amendment to its Complaint, so that document is part of the Complaint and is properly considered on the Bank's Motion to Dismiss. The Forbearance Agreement was attached not to the Complaint, but to the Bank's Motion to Dismiss. Although American quotes only from the First Amendment, the Forbearance Agreement itself is referenced in the Complaint and is central to American's claims that the Bank acted inequitably. American also has not questioned the authenticity of the Forbearance Agreement. Therefore, the Forbearance Agreement is also properly considered on the Bank's Motion to Dismiss.

## B. The Waiver and Release Defenses Do Not Warrant Dismissal

Both the Forbearance Agreement (in ¶ 17) and the First Amendment (in ¶ 18(a)) contain waiver and release clauses. It may be that these clauses could be affirmative defenses by the Bank to some or all of the contentions by American in its objections to the Bank's claims. These clauses could prove to be valid and enforceable against American. But at trial, American may be able to show that the waiver and release clauses were invalid, either through fraud, duress,

illegality, or mistake. *See Simmons v. Blauw*, 635 N.E.2d 601, 603 (Ill. App. Ct. 1994) (*citing*

*Frank Rosenberg, Inc. v. Carson Pirie Scott & Co.*, 192 N.E.2d 823 (Ill. 1963)). Indeed,

American asserts in its Response to the Bank's Motion to Dismiss that the waiver and release

clauses were in fact obtained by fraud and duress. Therefore, the Bank's Motion will be denied to

the extent it seeks to assert the affirmative defenses of waiver and release in a Rule 12(b)(6)

Motion to Dismiss, without prejudice to its right to assert those matters at trial.

### C. The Illinois Credit Agreements Act Does Not Warrant Dismissal of Counts I, II, IV, or VI

Under the Illinois Credit Agreements Act,

> [a] debtor may not maintain an action on or in any way related to a credit
> agreement unless the credit agreement is in writing, expresses an
> agreement or commitment to lend money or extend credit or delay or
> forbear repayment of money, sets forth the relevant terms and conditions,
> and is signed by the creditor and the debtor.

815 Ill. Comp. Stat. 160/2. A "credit agreement" is "an agreement or commitment by a creditor

to lend money or extend credit or delay or forbear repayment of money not primarily for

personal, family or household purposes, and not in connection with the issuance of credit cards."

*Id.* § 1(1). Unless there is a new agreement in writing, a debtor may not asset any claim, counter-

claim, or defense that a new credit agreement is created by an "agreement by a creditor to modify

or amend an existing credit agreement or to otherwise take certain actions, such as entering into a

new credit agreement, forbearing from exercising remedies in connection with an existing credit

agreement, or rescheduling or extending installments due under an existing agreement." *Id.* §

3(3). These provisions proscribe "all actions which depend for their existence" upon an unwritten

credit agreement. *Whirlpool Fin. Corp. v. Sevaux*, 96 F.3d 216, 225 (7th Cir. 1996).

The Bank argues that, even if all of American's allegations are true, the Illinois Credit Agreement Act bars their claims for equitable subordination (Count I), violations of the Illinois Consumer Fraud and Deceptive Business Practices Act (Count II), breach of the duty of good faith and fair dealing (Count IV), and subordination of the Bank's swap claim (Count VI) because those claims all rest on oral promises and other statements not included in the loan documents. However, as discussed below, none of these Counts should be dismissed as barred by the Illinois Credit Agreements Act because none rely solely on unwritten "credit agreements."

### 1. Equitable Subordination (Count I)

To support its claim for equitable subordination in Count I, American argues that, in executing the loan documents, the Bank represented that it would not enforce certain covenants of default because it knew American was in default on the date the documents were signed. It does not matter whether a "credit agreement" already existed when the Bank made this representation because the representation—if made—would itself qualify as a "credit agreement." It would then be an agreement by the Bank to delay repayment of money to which it was otherwise entitled. However, the fact that the Bank's purported representation was unwritten does not bar American's equitable subordination claim because that representation was only one of many instances of asserted inequitable conduct by the Bank. American also argues that the Bank wrongfully accelerated the loans, used covenant defaults offensively, and foisted upon American forbearance agreements, a restructuring officer, and a business plan that involved sale of the business. The equitable subordination claim relies on all of these acts; it does not "depend for [its] existence" upon only the Bank's unwritten "credit agreement." Therefore, Count I will

not be dismissed as barred by the Illinois Credit Agreements Act, though it will be dismissed for other reasons earlier stated.

### 2. Illinois Consumer Fraud and Deceptive Business Practices Act (Count II)

American's claim under the Illinois Consumer Fraud and Deceptive Business Practices Act again alleges the Bank's purported representation regarding the covenants of default. As discussed above, that representation was a supposedly unwritten "credit agreement" that bars any claims that "depend for their existence" on that agreement. However, American bases its claim on numerous other acts that do not involve any purported unwritten agreement. Those acts include the Bank's use of the covenants as a pretext to liquidate American's business and recover capital, inducing American to enter into a swap agreement that it knew was not economically feasible, and enforcing the covenants even though American was current on all payments. Because Count II is not based upon an unwritten "credit agreement," it will not be dismissed as barred by the Illinois Credit Agreements Act, though it will be dismissed for other reasons stated earlier.

### 3. Breach of Covenant of Good Faith and Fair Dealing (Count IV)

In Count IV of its complaint, American argues that the Bank breached its duty of good faith and fair dealing. In support, American argues that the Bank enforced the covenants of default even though they were not material terms of the Loan Documents and the Bank did not fear that its security under the documents was impaired. American also argues that the Bank used the threat of default on those covenants to take control of American's business and to attempt to force American to sell its business. On the face of the Complaint, these acts as pleaded do not involve "an agreement or commitment by a creditor to lend money or extend credit or delay or

-25-

forbear repayment of money." 815 Ill. Comp. Stat. 160/1. The Bank may be able to show later at

trial that American's good faith and fair dealing claim relies on an unwritten "credit agreement,"

such as a promise by the Bank to forbear in exchange for something. Because Count IV does not

contain any allegations of that nature, it will not now be dismissed as barred by the Illinois Credit

Agreements Act. However, for reasons stated earlier, the prayer for relief in Count IV will be

dismissed for failure to state a claim, but the Count may stand as a defense to the Bank's claim.

### 4. Objection to the Swap Claim (Count VI)

Certain elements of a credit transaction may be governed by the Illinois Credit

Agreements Act even though they are not themselves "credit agreements." *Bank One, Springfield*

*v. Roscetti*, 723 N.E.2d 755, 762–63 (Ill. App. Ct. 2000). Documents such as guaranties that are

integral to the credit transaction and integrated into the loan documents must be considered a part

of the overall "credit agreement" and not as isolated transactions. *Id.* at 763.

In its objection to the Bank's swap claim, American argues that the Bank failed to

provide certain information about the swap agreement. Interest rate swap agreements are

complicated financial instruments:

> Interest rate "swaps" are agreements to exchange fixed-rate and floating-
> rate interest obligations. Typically, each party agrees to make interest
> payments to the other calculated by reference to an agreed amount, the
> "notional amount" in swap parlance. One party pays interest on the
> notional amount at a fixed rate; the other at a floating rate. When the
> agreement expires, the obligations are netted and the party owing the
> greater amount, if any, pays the excess. Swap agreements are used to
> manage interest rate risk or to speculate on interest rate movements.

*Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1267 (7th Cir. 1996). In

this case, the swap agreement was not itself a "credit agreement." The Bank did not commit in

the swap agreement to lend any money or extend credit, nor did it agree in writing to delay or forbear in collecting money. The agreement was simply a method for American to hedge its interest rate risk.

The Bank, however, argues that the swap agreement was integrated into the loan documents, and therefore is governed by the Illinois Credit Agreements Act. The swap agreement was executed sometime before October 2, 2006, and the loan and security agreement was executed on October 12, 2006. The loan and security agreement does reference swap agreements generally, making performance under any swap agreement an obligation under the loan. However, the loan and security agreement does not specifically refer to the October 2, 2006, swap agreement. These allegations, without more, do not show that the swap agreement was an integral part of the loan, such that the Bank would not have extended the loan had American not entered into the swap agreement. Because that is not clear on the face of the Complaint, the swap agreement cannot now be considered part of the larger "credit agreement" shown by the loan documents.

Even if the swap agreement was itself a "credit agreement" or was considered as part of the larger "credit agreement" between American and the Bank, American does not base its objection to the swap claim solely on purported unwritten representations. American also objects on the basis that $550,000 of the claim is a penalty subject to subordination under 11 U.S.C. § 510(c) and that the claim is for unmatured interest that should be disallowed under 11 U.S.C. § 502(b). Neither of these claims relies on any purported unwritten representation by the Bank. Therefore, Count VI will not be dismissed as barred by the Illinois Credit Agreements Act.

## CONCLUSION

For reasons stated above, the prayers for relief in Counts IV and V will be dismissed because Illinois law does not recognize them as affirmative claims, although those two Counts will stand as defenses to the Bank's claims. Counts I, II, III, and VIII will be dismissed for failure to plead plausible claims for relief. Count VI will not be dismissed because it is not barred by the Illinois Credit Agreements Act. An order to that effect will be separately entered.

ENTER:

Jack B. Schmetterer
United States Bankruptcy Judge

Dated this 13th day of July, 2010.

-28-

Case No. 10 B 00154

American Consolidated Transportation Companies, Inc. v. RBS Citizens N.A., d/b/a Charter One

## CERTIFICATE OF SERVICE

I, Dorothy Clay, certify that on July 14, 2010, I caused to be served copies of the foregoing

document to the following by U.S. Mail, and by electronic mail to those who have consented to such

service.

_____
Secretary/Deputy Clerk

## SERVICE LIST

**Electronic Service through CM/ECF System**

Sarah E. Lorber
The Law Office of William J. Factor
105 W. Madison
Suite 400
Chicago, IL 60602
Counsel for Debtor

William J. Factor
The Law Office of William J. Factor, Ltd
1363 Shermer Road
Suite 224
Northbrook, IL 60062
Counsel for Debtor

Thomas M. Lombardo
Ricmer & Braunstein, LLP
71 S. Wacker Drive, Suite 3515
Chicago, IL 60606
Counsel for RBS Citizens, N.A.

Jeffrey D. Ganz
Riemer & Braunstein, LLP
Three Center Plaza
Boston, MA 02108
Counsel for RBS Citizens, N.A.